UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
Z.A.R., Mother and Natural Guardian of E.J., and    :
Z.A.R., individually                                :
                                                    :
                              Plaintiffs,           :          **REPORT &**
                                                    :          **RECOMMENDATION**
                    -against-                       :
                                                    :          19-cv-2615 (CBA) (PK)
THE CITY OF NEW YORK and NEW YORK    :
CITY DEPARTMENT OF EDUCATION,        :
                                                    :
                              Defendants.           :
                                                    :
------------------------------------------------------------- x

**Peggy Kuo, United States Magistrate Judge:**

Plaintiff Z.A.R. brings this action individually and on behalf of her child E.J. against

Defendants The City of New York and New York City Department of Education (the "DOE" and

collectively with the City of New York, "Defendants") pursuant to the Individuals with Disabilities

Education Act ("IDEA"). Plaintiff seeks review and reversal of a final administrative decision by a

New York State Review Officer denying her tuition reimbursement following E.J.'s unilateral

placement at a private school. (Dkt. 14.) The parties cross-moved for summary judgment. (Dkts. 40,

41.) The Honorable Carol Bagley Amon referred the motions to the undersigned. (Dkt. Entry Dec.

5, 2019.) For the reasons below, the undersigned recommends Plaintiff's motion be GRANTED and

Defendants' motion be DENIED.[1]

## BACKGROUND

### I.    Overview of the IDEA

The following overview of the IDEA will assist in interpreting the factual background of the

case:

---
[1] Plaintiff's Amended Complaint requests costs and attorneys' fees, but her motion for summary judgment does not request this relief. The undersigned therefore makes no recommendation as to this relief.

Under the IDEA, qualifying disabled students are entitled, each year, to free appropriate public education ("FAPE") that conforms to a tailored education plan designed for their particular needs. The education plan, called an Individualized Education Program ("IEP"), must be developed annually by a Committee on Special Education ("CSE")—a committee comprising at least "the student's parent(s), a representative of the school district, a special education provider, a general education teacher if the student is being considered for a general education environment, and any other individual with special knowledge or expertise concerning the child." In New York, decisions made by CSEs can be appealed to an Impartial Hearing Officer ("IHO"), and decisions made by IHOs can, in turn, be appealed to a State Review Officer ("SRO"). A dissatisfied party may seek judicial review of an SRO decision.

Parents of students covered under the IDEA may unilaterally reject the placement recommended by the CSE, choosing to enroll the student(s) elsewhere while they appeal the CSE's recommendation if they find that recommendation unsuitable. In doing so, parents can seek DOE funding for the tuition of their preferred placement if they can demonstrate: (1) that the CSE's recommended placement does not comply with the IDEA; (2) that the placement favored by the parent is appropriate given the needs of the child; and (3) that equitable considerations favor reimbursement. Parents who unilaterally reject the recommended placement during the pendency of an appeal of the CSE's decision do so at their own financial risk.

*J.L. v. New York City Dep't of Educ.*, No. 15-CV-1200 (CBA)(RER), 2016 WL 6902137, at *1 (E.D.N.Y. Nov. 22, 2016) (internal citations and quotations omitted).

## II.    Factual History

These facts are taken from the SRO administrative record (Dkt. 18-1), Defendants' Rule 56.1 Statement of Material Facts (Dkt. 42), and Plaintiff's Rule 56.1 Counterstatement of Material Facts (Dkt. 44.) All page number references are to the ECF page number, not the document page number, and all references to testimony are to the testimony provided in hearings before the IHO.

### A.    E.J.'s Educational History and the 2016 Appeal

E.J. is a bright student with recognized disabilities. (Dkt. 18-1 at 51; Dkt. 42 ¶ 1-2; Dkt. 44 ¶ 1-2.) Her education was the subject of a prior New York State administrative review under the IDEA for the 2013-14, 2014-15, and 2015-16 school years (the "2016 Appeal"). (Dkt. 18-1 at 7.) The record in this matter does not include the full record in the 2016 Appeal, but the SRO decision includes references to it. (Dkt. 18-1 at 7-8, 22-23.) The facts of that appeal are not relevant here, except that

the IHO in the 2016 Appeal concluded that reevaluations for E.J. were necessary, including speech language, occupational therapy ("OT"), audiological, central auditory processing, and visual perception processing evaluations, to be funded by the DOE, along with a classroom observation and updated neuropsychological evaluation. (Dkt. 18-1 at 22-23.) Plaintiff challenged those determinations, but her arguments were found insufficient and the IHO's conclusions were upheld. (Dkt. 18-1 at 8.)

Pursuant to the IHO's determination in the 2016 Appeal, Plaintiff and the DOE entered into a written agreement whereby the DOE would fund the reevaluations. (Dkt. 18-1 at 22-23.) It is not clear from the record when the parties entered into that written agreement, and the agreement itself was not part of the record provided here.

E.J. has attended the Summit School, a New York State-approved non-public school, since the 2016-17 school year. (Dkt. 18-1 at 8.)

### B.    Scheduling the 2017-18 IEP Meeting

The DOE first contacted Plaintiff to schedule a CSE meeting to develop E.J.'s 2017-18 IEP in February 2017. (Dkt. 18-1 at 19, 785-86.) A DOE school psychologist testified that she mailed a notice to Plaintiff on February 22, 2017 scheduling a reevaluation for March 25, 2017 and an initial CSE meeting for April 21, 2017. (Dkt. 18-1 at 19, 172-73, 785-86.)[2] Plaintiff later wrote in an email to the DOE school psychologist that she was never notified of the initial request for testing on March 25, 2017. (Dkt. 18-1 at 723.)

Neither Plaintiff nor E.J. appeared for the March 25, 2017 reevaluation, and the DOE rescheduled it for May 13, 2017. (Dkt. 18-1 at 19, 173-74, 785.) The originally planned April 21, 2017 CSE meeting was also canceled. (Dkt. 18-1 at 19, 174, 785.) The DOE school psychologist called

---

[2] The record includes an event log that details communications, including emails exchanged between Plaintiff and the DOE.

Plaintiff on multiple occasions to reschedule the meeting but was unable to reach Plaintiff or to leave voicemails.  (Dkt. 18-1 at 19, 174, 785.)  The DOE school psychologist also called E.J.'s father and left voice messages for him.[3]  (Dkt. 18-1 at 19, 174, 785.)  On April 20, 2017, the DOE school psychologist sent an email to Plaintiff notifying her that the reevaluation was rescheduled for May 13, 2017, and that the CSE meeting was rescheduled for May 30, 2017.  (Dkt. 18-1 at 19, 174-75, 784-85.)

In a May 10, 2017 email, Plaintiff wrote to the DOE school psychologist requesting that the reevaluation be rescheduled again, and noted that she would be "available any day during the week of June 19th-23rd" for a CSE meeting to develop E.J.'s 2017-18 IEP.  (Dkt. 18-1 at 722, 784; Dkt. 42 ¶ 5.)  Plaintiff also wrote that "If you would like to speak with me I can be reached by cell … or by email as well."  (Dkt. 18-1 at 722, 784.)

The DOE school psychologist testified that she sent an email and a letter to Plaintiff notifying her that she would schedule a CSE meeting during the week of June 19-23 and requesting a signed consent form to reschedule E.J.'s reevaluations.  (Dkt. 18-1 at 19, 176-77.)  A DOE electronic event log entered into evidence at the IHO hearing and referenced in the DOE school psychologist's testimony shows an entry on May 12, 2017 consistent with the DOE school psychologist's testimony. (Dkt. 18-1 at 783.)

In another email dated May 13, 2017, Plaintiff wrote that she had not given permission for the CSE to communicate with her by email and instructed DOE to "send all communications regarding meetings and other requests in writing to my home address."  (Dkt 18-1 at 723, 781; Dkt. 42 ¶ 4.) Plaintiff noted that E.J. had "current" evaluations because they were less than three years old, and asked whether there was "some reason why the CSE is requesting new evaluations where current evaluations exist?"  (Dkt. 18-1 at 723, 781.)

---

[3] Plaintiff is E.J.'s custodial parent and responsible for all decisions regarding her education.  (Dkt. 44 ¶ 4.) E.J.'s father is not involved in decisions regarding her education.  (Dkt. 44 ¶ 4.)

In a separate May 13, 2017 email, Plaintiff wrote to a different DOE employee stating that she did not consent to email communications and again "request[ed] that all communications need to be mailed." (Dkt. 18-1 at 728.)  Plaintiff again wrote that E.J.'s testing was less than three years old and therefore current and asked for clarification as to why E.J.'s existing evaluations could not be considered at the upcoming CSE meeting.  (*Id.*)  The DOE employee replied on May 15, 2017, first acknowledging Plaintiff's preference not to communicate through email, and then suggesting that Plaintiff contact the DOE school psychologist to discuss "any questions or concerns." (Dkt. 18-1 at 727.)

In another email on May 24, 2017 to the DOE school psychologist, Plaintiff reiterated her position that E.J.'s evaluations were current and again "requested the reasons why new evaluations were needed." (Dkt. 18-1 at 722.)  The DOE school psychologist explained in a reply email that reevaluations were needed to assess whether E.J. still had an educational disability and whether she still needed special education services. (*See* Dkt. 18-1 at 177-79, 781-82.)  In response, Plaintiff emailed the DOE school psychologist a copy of E.J.'s 2014 neuropsychological evaluation. (Dkt. 18-1 at 782.)  The DOE acknowledged receipt of that email but wrote that DOE already had that 2014 evaluation and noted that her "academic skill development has likely changed since [2014]." (*See* Dkt. 18-1 at 177-79, 781-82.)[4]

The parties dispute whether Plaintiff was properly notified of the exact date of the CSE meeting.  The DOE school psychologist testified that she mailed Plaintiff notice of the June 20, 2017 CSE meeting. (Dkt. 42 ¶ 5; Dkt. 18-1 at 181 (testimony that "a meeting notice was mailed for 6/20"); Dkt. 18-1 at 759 (handwritten notation on CSE minute meeting that "letter mailed 5/12").)  The

---

[4] The DOE event log includes the text of the May 24, 2017 email chain in which the DOE school psychologist explains the need for updated testing. (Dkt. 18-1 at 781-82.)  Only the log of the emails with the text of the emails copied into the log is provided, and not the emails themselves. (*See* Dkt. 18-1 at 219-220) (testimony of DOE school psychologist stating that "I just copy and paste straight from the – straight from my emails. I copy and paste" into the event log.)

record includes a copy of a May 12, 2017 notice that she claims to have mailed. (Dkt. 18-1 at 756-58 (copy of June 20, 2017 notice).)[5] It also states that the "Meeting can be conferenced by phone… email [the DOE school psychologist] to confirm." (Dkt. 18-1 at 756.) The third page of the notice in the record contains Plaintiff's address, but there is no postmark, date stamp or other indication that the letter was, in fact, mailed. (Dkt. 18-1 at 758.) The DOE event log includes an entry by the DOE school psychologist on May 12, 2017 stating, "'Notice of IEP Meeting: Reevaluation/Annual Review' sent for [E.J.] Letter sent today." (Dkt. 18-1 at 783.) Plaintiff testified that she never received the letter and disputes that the mailing took place. (Dkt. 44 ¶ 5; Dkt 18-1 at 566-67.)

The parties also dispute whether the Summit School had proper notice of or was invited to participate in the CSE meeting prior to June 20, 2017. Although the DOE school psychologist testified that she invited the Summit School to the CSE meeting "through Outlook," there is no copy of the meeting invitation in the record, and the DOE event log does not include reference to an Outlook invitation. (*See* Dkt. 18-1 at 254.) The DOE school psychologist testified that, because the Summit School provided documents in advance of the CSE meeting, she believed the school had notice of the meeting. (Dkt. 42 ¶ 7; Dkt. 18-1 at 255-57.) The Summit School clinical director testified that the school did not have prior notice of the meeting. (Dkt. 44 ¶ 7; Dkt. 18-1 at 333-34.) Other Summit School employees also testified that they did not have notice of the CSE and would have participated if they had. (Dkt. 44 ¶ 7; Dkt. 18-1 at 381-82; 409-410; 519-520.)

## C.    June 2017 CSE Meeting

E.J. was not reevaluated. Nevertheless, a Committee on Special Education met on June 20, 2017 to develop E.J.'s 2017-18 IEP. (Dkt. 42 ¶ 3.) E.J.'s teachers from the Summit School did not attend the CSE meeting, but the Summit School clinical director did attend by phone. (*See* Dkt. 42 ¶

---

[5] Although dated May 12, 2017 and indicating the date of the meeting as June 20, 2017, the notice also states that "The IEP Meeting must be held no later than 04/23/2017."

6

7; Dkt. 18-1 at 21-22.)  The Summit School clinical director asked for the meeting to be postponed so Plaintiff could attend, but the meeting went forward without her.  (Dkt. 44 ¶ 7; *see also* Dkt. 18-1 at 709.)

The parties dispute whether DOE attempted to contact Plaintiff immediately before or during the meeting to try to secure her attendance.  Plaintiff contends that she did not receive any phone calls on the day of the meeting.  (Dkt. 44 ¶ 6; Dkt. 18-1 at 567.)  Plaintiff further contends that she received an email the next day "that did not state that an IEP meeting was taking place at the time the email was sent or that her participation in an IEP meeting was needed."  (Dkt. 44 ¶ 6; *see* Dkt. 18-1 at 710.) The DOE school psychologist testified that she did attempt to contact Plaintiff by phone and email before and during the meeting.  (Dkt. 42 ¶¶ 4, 6; Dkt. 18-1 at 214.)  The Summit School's records include a notation by the clinical director that the DOE school psychologist attempted to call Plaintiff before and at the end of the CSE meeting.  (Dkt. 18-1 at 709.)  The DOE's records contain notes of attempted calls before, during, and at the end of the meeting, to the cellphone number provided by Plaintiff.  (Dkt. 18-1 at 759-60, 781.)  The record contains a copy of an email dated June 20, 2017, without a time stamp, from the DOE school psychologist to Plaintiff.  (Dkt. 18-1 at 710.)  In that email, the DOE school psychologist wrote that she was "trying to call the number provided for [E.J.'s] meeting … It rings busy," and requested a call back.  (*Id.*)  Plaintiff called the DOE school psychologist on June 21, 2017 in response to the email, but there was no answer and no return call.  (Dkt. 44 ¶ 6; Dkt. 18-1 at 577-78.)

The CSE meeting convened on June 20, 2017 with the DOE school psychologist, a district special education teacher, and the Summit School clinical director.  (Dkt. 18-1 at 8, 753, 755.)

### D.    2017-18 IEP

The parties disagree on which documents the CSE relied upon when developing the IEP.  The DOE contends that the CSE reviewed several documents in preparing E.J.'s IEP, including "a June

2014 psycho-educational evaluation, a December 2014 neuropsychological consultation report, a March 2016 Occupational Therapy evaluation, a September 2016 IEP, a 2016-2017 mid-year evaluation report, a December 2016 speech-language progress report, a January 2017 counseling progress report, and results from school-wide assessments." (Dkt. 42 ¶ 8.)  The DOE states that it did not consider other evaluative materials.  (Dkt. 42 ¶ 9.)  Plaintiff argues that "[t]he prior written notice reflects that the school psychologist based her recommendation solely on Summit School records" and that the DOE school psychologist "was of the incorrect belief that E.J did not receive occupational therapy during the 16-17 school [year]…" (Dkt. 44 ¶ 8.)[6]  The section of the DOE "Prior Written Notice" describing "each evaluation procedure, assessment, record, or report used in the decision to propose or refuse the action" only lists "School Documents/Progress Reports."  (Dkt. 18-1 at 761.)  In addition, Plaintiff argues that the CSE did not consider E.J's visual needs and failed to include vision-related goals in the IEP.  (Dkt. 44 ¶ 8.)  Plaintiff also contends that the CSE considered other evaluative materials, including testing results.  (Dkt. 44 ¶ 9.)

The IEP itself directly or indirectly references all the documents that DOE claims it considered when developing the IEP.  (Dkt. 18-1 at 730 (June 2014 psycho-education evaluation, September 2016 IEP, school-wide assessments); 731 (December 2014 neuropsychological consultation report and school-wide testing); 731-735 (mid-year, speech, and counseling reports); 735 (March 2016 OT evaluation, visual perceptual test and visual motor integration test, September 2016 IEP).)  The IEP also references certain testing results.  (Dkt. 18-1 at 730 (referencing Terra Nova and Wide Range Achievement Test ("WRAT") evaluations).)[7]

---

[6] The Prior Written Notice is a document that informs parents in writing of the DOE's recommendations concerning special education services.  *See* 34 C.F.R. § 300.503 (describing prior notice requirement).

[7] Although it is not clear from the record, these may be the same as the school-wide testing results referenced by the DOE.

The IEP included a recommendation that E.J. participate in a general classroom setting with ten weekly periods of "integrated co-teaching" ("ICT") for English, math, social studies, and sciences, along with individual counseling, OT, and speech-language services. (Dkt. 42 ¶ 10; Dkt. 18-1 at 746-753.)    The IEP also included testing accommodations and recommended specific educational interventions. (Dkt. 42 ¶ 10-11; Dkt. 18-1 at 746-753.)[8]    The IEP considered a "Special Class in a community school 12-1" and "Special Class in a community school 12-1+1" but rejected those options because they were "determined not appropriate." (Dkt. 18-1 at 753.)    The IEP also considered a "NYSED-Approved Non Public School - Day" but it was "deemed too restrictive." (*Id.*)

The DOE sent the Prior Written Notice and the IEP to Plaintiff on or about June 27, 2017. (Dkt. 18-1 at 761-764, 780.)[9]

### E.    The Unilateral Placement

On August 22, 2017, Plaintiff submitted a "Ten-Day Notice"[10] to DOE informing it that E.J.'s IEP was not appropriate and denied her a FAPE, and that E.J. would therefore be unilaterally placed at the Summit School for the 2017-18 school year. (Dkt. 18-1 at 54-55, 682-684.)    E.J.'s tuition was $34,088.00. (Dkt. 18-1 at 55, 695.)

Plaintiff unilaterally enrolled E.J. at the Summit School on September 7, 2017. (Dkt. 42 ¶ 13; Dkt. 18-1 at 695.)

---

[8] Plaintiff disputes whether a few of those educational interventions were actually recommended, as opposed to merely discussed in the IEP. (Dkt. 44 ¶ 11.)  The IEP includes these additional interventions under a section titled "Management Needs," but the IEP merely notes that E.J. "responds well to" those interventions, rather than outright recommending them. (Dkt. 18-1 at 737.)  It does not include them on the list of recommended special education programs and services. (*See* Dkt. 18-1 at 746-747.)

[9] The letter notifying Plaintiff of the IEP is dated June 26, 2017 but the DOE event log states it was mailed on June 27, 2017. (*Compare* Dkt. 18-1 at 761 *with* 780.)

[10] Federal regulations require parents to notify a school district at least ten business days before unilaterally placing their child at a non-public school. 34 C.F.R. § 300.148(d)(1)(ii).

### III.    **The State Administrative Proceedings**

#### A.    **Due Process Complaint**

On November 9, 2017, Plaintiff sent to the DOE an impartial hearing complaint, which the parties also refer to as a "Due Process Complaint." (*See* Dkt. 18-1 at 629-631.) In it, Plaintiff argued that E.J.'s IEP denied her a FAPE. (Dkt. 18-1 at 629.) Plaintiff also contended that she had no advance notice of the June 20, 2017 CSE meeting, that at the time of the meeting the Summit School contested the meeting going forward without the parent, and that the DOE school psychologist denied Plaintiff meaningful participation in the development of E.J.'s IEP. (Dkt. 18-1 at 629.) Plaintiff further argued that the IEP was predetermined, that the Summit School was an appropriate placement for E.J., and that while she had cooperated with DOE, DOE had not been cooperative with her. (Dkt. 18-1 at 630.) She requested an interim order for busing and an award of tuition. (Dkt. 18-1 at 630-31.)

#### B.    **The IHO Decision**

An IHO was appointed on November 10, 2017 to hear Plaintiff's appeal. (Dkt. 18-1 at 50.) The IHO held eight hearings between December 14, 2017 and April 30, 2018, at which the IHO heard arguments and testimony from both Plaintiff's and Defendants' witnesses. (*Id.*)

The IHO did not make an express finding of procedural inadequacy in the development of the IEP. Substantively, the IHO found that the IEP's recommendation of ICT services in a general education classroom was not appropriate because the class would not include students of E.J.'s ability (referred to as "functional grouping"), and she would not receive sufficient support in class. (Dkt. 18-1 at 56.) The IHO noted that E.J. "require[s] a class in which she can be grouped with students with similar cognitive levels and provided with a substantial amount of attention...." (*Id.*)

However, the IHO found that it was "unclear" whether the Summit School was an appropriate placement. (*Id.*) The IHO noted that "there is no evidence that the students in the [E.J.'s] class are

gifted or that she is grouped with gifted students." (*Id.*)  Based on records from the Summit School, the IHO "question[ed] whether the work assigned meets [E.J.'s] needs, and perhaps, whether she is being sufficiently challenged." (Dkt. 18-1 at 53.)  The IHO further noted that E.J. "performed inconsistently at the Summit School during the 2016-2017 school year, and continues to struggle with the same issues during the current school year." (Dkt. 18-1 at 56.)  The IHO found that the evidence did not show that the Summit School was an appropriate placement.  (Dkt. 18-1 at 57.)

The IHO also found that the equities weighed against tuition reimbursement.  (*Id.*)  The IHO noted that "the Parents did not cooperate in having the Student evaluated, which hampered the development of an appropriate IEP." (*Id.*)  The IHO also found that although Plaintiff contended that she did not participate in the June 20, 2017 meeting because she did not receive the DOE's notice, she failed to include this information in her ten-day notice.  (*Id.*)  According to the IHO, if this information had been provided, "DOE would have been on notice that they should reconvene the CSE." (*Id.*)

The IHO ordered remedial efforts by the DOE, including reevaluations of E.J., and directed the CSE to convene to review those reevaluations and "to make an appropriate recommendation." (Dkt. 18-1 at 58-59.)[11]

## C.    The SRO Decision

Plaintiff appealed the IHO's determination to the SRO, and the DOE cross-appealed.  (Dkt. 18-1 at 10-11.)[12]

The SRO rejected Plaintiff's arguments concerning procedural inadequacies in the development of the IEP.  The SRO reviewed in detail the evidence regarding whether Plaintiff had

---

[11] The IHO also issued an interim order on December 14, 2017, ordering bussing for E.J. to the Summit School. (Dkt. 18-1 at 45.)  That decision has not been appealed by either side.

[12] The SRO made several administrative procedural findings that the parties do not raise on appeal here.  (Dkt. 18-1 at 16-18.)

notice of the June 20, 2017 CSE meeting. (Dkt. 18-1 at 19-22.) The SRO found that Plaintiff's "testimonial assertions" regarding lack of notice of the June 20, 2017 CSE meeting did not outweigh the DOE's evidence that it provided notice and attempted to secure Plaintiff's presence at the meeting. (Dkt. 18-1 at 20-21.) The SRO therefore concluded that Plaintiff's lack of attendance at the meeting was not an IDEA procedural violation and that the DOE did not impede her participation in developing E.J.'s IEP. (Dkt. 18-1 at 21.) The SRO also concluded that, although the CSE meeting did not include "a regular education teacher of the student" as required by 20 U.S.C. § 1414(d)(1)(B)(ii), Plaintiff's refusal to consent to reevaluations for E.J. and failure "to respond to the attempts to gain her participation in the CSE" weighed against a finding of procedural inadequacy. (Dkt. 18-1 at 21-22.)

Regarding Plaintiff's refusal to consent to reevaluations, the SRO found that because E.J.'s initial evaluations were more than a year old, the DOE's request for reevaluations was proper, particularly in light of the 2016 Appeal's finding that reevaluations were needed. (Dkt. 18-1 at 22-23.) The SRO noted that because of Plaintiff's refusal to consent to reevaluations, the DOE could have considered E.J. entirely ineligible for special education; however, the DOE considered her eligible based on her 2014 evaluations. (Dkt. 18-1 at 23-24.) The SRO then undertook a detailed review of the evaluations available to the CSE and concluded that the CSE appropriately considered the available information in developing the IEP. (Dkt. 18-1 at 24-31.) The SRO found that, to the extent the CSE did not consider "the full range of the student's strengths and weaknesses," the parent's refusal to consent to reevaluations was the cause of that deficiency. (Dkt. 18-1 at 24.)

Nevertheless, the SRO upheld the IHO's conclusion that the IEP denied E.J. a FAPE, but on different grounds. The SRO rejected the IHO's functional grouping conclusions as outside the scope of the IHO's review. (Dkt. 18-1 at 34.) The SRO conducted a detailed weighing of the appropriateness of the IEP's recommendation of ICT in a general education classroom based on the

evidence presented to the IHO. (Dkt. 18-1 at 31-34.) The SRO's assessment was highly individualized, noting that while "ICT services that include both a full-time special education teacher and a full-time regular education teacher" would generally provide a student with E.J.'s profile with a FAPE, the records from the Summit School suggested that such ICT services would be insufficient for E.J., given her "gradual or inconsistent progress" in school and her "difficulties with attention and distractibility." (Dkt. 18-1 at 33-34.) The SRO wrote,

> One factor that might have allayed my concerns would have been the input of a regular education teacher at the CSE meeting who was familiar with how a student with this level of distractibility could or could not make progress toward her annual goals in an ICT setting, but … no regular education teacher participated in the development of the IEP.

(Dkt. 18-1 at 34.) The SRO thus concluded that the DOE failed to meet its burden to show that a general education class with ICT services would be appropriate for E.J., and therefore failed to show that the DOE offered a FAPE. (*Id.*)

The SRO then determined, contrary to the IHO's findings, that the Summit School was an appropriate placement for E.J. (Dkt 18-1 at 34-41.) The SRO's detailed legal description and factual findings concluded that although E.J.'s progress was inconsistent, the Summit School had instruction "specially designed to meet [E.J.'s] needs." (*Id.*) The SRO therefore concluded that the Summit School was an appropriate placement. (Dkt. 18-1 at 41.)

The SRO ultimately decided, however, that the hearing record supported the IHO's determination that equitable considerations favored a complete denial of tuition reimbursement. (*Id.*) The SRO repeated its rejection of Plaintiff's arguments concerning both the need for reevaluations and the lack of notice of the June 2017 CSE meeting. (Dkt. 18-1 at 42.) The SRO found that the combined effect of Plaintiff's refusal to permit a reevaluation of E.J. and failure to attend the CSE meeting supported a finding that she was uncooperative with the process of developing E.J.'s IEP. (Dkt. 18-1 at 42.) The SRO specifically noted that, had Plaintiff been more cooperative, "the CSE

might have avoided some of the defects later found in the IEP." (*Id.*)  The SRO thus affirmed the IHO's determination that the equities weighed against reimbursement or direct funding of E.J.'s Summit School tuition.  (*Id.*)

The SRO summarily dismissed Plaintiff's remaining requests for relief.  (*Id.*)

## IV.    <u>Standard of Review</u>

In the context of the IDEA, summary judgment is a "pragmatic procedural mechanism" that "involves more than looking into disputed issues of fact."  *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 184 (2d Cir. 2012) (quoting *A.C. ex rel. M.C. v. Bd. of Educ.,* 553 F.3d 165, 171 (2d Cir. 2009) (internal quotations omitted)).  "Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination..."  *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012) (quoting *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n. 3 (2d Cir. 2005)).

"Pursuant to the statute, the court is to receive the records of the administrative proceedings; hear additional evidence at the request of a party; and, basing its decision on the preponderance of the evidence, grant such relief as the court determines is appropriate."  *J.L.*, 2016 WL 6902137 at *4 (internal alterations and quotations omitted).

A district court's review of "state educational decisions under the IDEA is 'circumscribed.'"  *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (quoting *Muller v Comm. On Special Educ.*, 145 F.3d 95, 101 (2d Cir. 1998)).  "Courts generally 'defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer.'"  *M.H.*, 685 F.3d at 241 (quoting *A.C.,* 553 F.3d at 171).  "When the IHO and SRO decisions conflict, the district court defers to the SRO's decision as the 'final decision of the state authorities.'"  *M.B. ex rel. L.C. v. Minisink Valley Cent. Sch. Dist.*, 523 Fed. App'x 76, 77 (2d Cir. 2013) (quoting *R.E.*, 694 F.3d at 189 (internal quotation marks omitted)).  But the Court "do[es] not 'simply rubber stamp administrative decisions.'"

14

*R.E.*, 694 F.3d at 184 (quoting *Walczak v. Fla. Union Free Sch. Dist.,* 142 F.3d 119, 129 (2d Cir. 1998)). The weight of the deference given to an SRO's decision "will vary based on the type of determination at issue." *M.H.*, 685 F.3d at 244. Substantive decisions on state education policy, the appropriateness of unilateral placements, and other decisions that fall within the expertise of state administrative officers, as well as determinations based on "thorough and logical reasoning," and credibility determinations are entitled to greater deference. *See id.* By contrast, procedural determinations, questions of law, and equitable determinations are entitled to less deference. *See id.; see also G.S. by & through L.S. v. Fairfield Bd. of Educ.*, No. 3:16-CV-1355 (JCH), 2017 WL 2918916, at *13 (D. Conn. July 7, 2017) ("the Hearing Officer's determination as to the equitable considerations is entitled to minimal deference: it is not the type of question on which the Hearing Officer might be expected to bring special expertise to bear.").

## V.      Legal Standards under the IDEA

A state receiving federal funds under the IDEA must provide disabled children with a FAPE. *See Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 192 (2d Cir. 2005). "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ('IEP') for each such child." *R.E.*, 694 F.3d at 15 (citing 20 U.S.C. § 1414(d) and *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.,* 297 F.3d 195, 197 (2d Cir. 2002)).

"The IEP is 'a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" *R.E.*, 694 F.3d at 175 (quoting *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.,* 465 F.3d 503, 507–08 (2d Cir. 2006) (internal quotation marks omitted)). "The IDEA requires that an IEP be 'reasonably calculated to enable the child to receive educational benefits.'" *R.E.*, 694 F.3d at 174–75 (quoting *Bd. of Educ. v. Rowley,* 458 U.S. 176, 207 (U.S. 1982)).

New York "has assigned responsibility for developing IEPs to local Committees on Special Education ('CSEs')." *Walczak,* 142 F.3d at 123 (quoting N.Y. Educ. Law § 4402(1)(b)(1)). By statute, E.J.'s CSE was required to include at least her parent, her regular education teacher, her special education teacher, and a school board representative. N.Y. Educ. Law § 4402(1)(b)(1)(a); *see also* 20 U.S.C. § 1414(d)(1)(B)(ii) and (iii). "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." *R.E..,* 694 F.3d at 175 (citing *Gagliardo,* 489 F.3d at 107–08).

If parents believe the state has failed to provide a FAPE, they "may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." *A.C.,* 553 F.3d at 171 (quoting *Gagliardo,* 489 F.3d at 111). A parent may then file a due process complaint "with the appropriate state agency." *R.E.,* 694 F.3d at 175 (citing 20 U.S.C. § 1415(b)(6)).

In New York, if parents contest the IEP, parents and the relevant school district appear before an IHO who issues a written decision, *see* N.Y. Educ. Law § 4404(1), and if either party objects to the IHO's decision, they may appeal to an SRO, who either affirms or modifies the IHO's order, *id.* § 4402(2). Either party may then appeal to a state or federal court for review of the SRO's decision. 20 U.S.C. § 1415(i)(2)(A).

On review, district courts in the Second Circuit evaluate IDEA claims under the "Burlington-Carter Test." *See J.L.,* 2016 WL 6902137 at *4 (referencing *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.,* 471 U.S. 359 (1985)). Under this three-prong test, the district court first considers whether the IEP complies with the IDEA's procedural and substantive requirements. *See R.E.,* 694 F.3d at 189-90. If the IEP is either procedurally or substantively deficient, the court must then determine whether the parent's unilateral placement was appropriate. *See A.C.,* 553 F.3d at 171–72. For the third prong, the court must determine whether a parent is entitled to tuition payment or reimbursement, and may

take into account equitable considerations in fashioning appropriate relief. *See Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363-64 (2d Cir. 2006).

## VI.    The Parties' Requested Relief

In her Motion for Summary Judgment and Opposition to Defendants' Motion to Dismiss, Plaintiff seeks to vacate the SRO's complete denial of tuition funding for E.J.'s placement at the Summit School. She urges the Court to reverse the SRO's findings of procedural compliance, uphold the SRO's determinations that E.J. was substantively denied a FAPE and that the Summit School was an appropriate placement, and find that the equities do not weigh in favor of tuition denial.

In their cross-motion for Summary Judgment and Reply in support, Defendants urge the Court to deny Plaintiff's request for tuition funding. They argue that the SRO's findings of procedural compliance were correct. Defendants further contend that Plaintiff had waived any substantive challenges to the IEP and they should not have been considered below, and that in any event E.J. was not denied a FAPE. Defendants also urge the Court to adopt the IHO's conclusion that the Summit School was not an appropriate placement for E.J. Finally, Defendants argue that complete denial of tuition was an appropriate equitable determination.[13]

## DISCUSSION

## I.    Prong I of the Burlington-Carter Test: Procedural and Substantive Compliance with the IDEA

### A.    Procedural Compliance with the IDEA

A court must first examine "whether the state has complied with the procedures set forth in the IDEA." *Cerra*, 427 F.3d at 192. A procedural violation denies a student a FAPE only if it:

(I) impeded the child's right to a free appropriate public education;

(II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents'

---

[13] Defendants also argue that Plaintiff failed to file a counterstatement of material facts, but Plaintiff did file such a counterstatement at Dkt. 44.

child; or

(III) caused a deprivation of educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii); *see also R.E.*, 694 F.3d at 190.  "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *R.E.*, 694 F.3d at 190.

Procedural safeguards are essential to the system Congress created in drafting the IDEA.  *See Rowley*, 458 U.S. at 205 ("When the elaborate and highly specific procedural safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid.")

Plaintiff contends that the DOE violated the IDEA's procedural requirements because neither she nor the Summit School had proper notice of the CSE meeting.  The DOE argues that the IHO and SRO's findings of procedural compliance with the IDEA should be upheld.

The state administrative officers' procedural findings are entitled to less deference than their substantive determinations.  *See M.H.*, 685 F.3d at 244.

### 1.    *Parental Notice of the CSE meeting*

The IEP must be "collaboratively developed by the parents of the child, educators, and other specialists."  *Frank G.*, 459 F.3d at 363 (quoting 20 U.S.C. § 1414(d)(1)(B) and *Honig v. Doe,* 484 U.S. 305, 311 (1988)).  School districts must "ensure that the parents of each child with a disability are members of any group that makes decisions on the *educational placement* of their child."  *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 79 (2d Cir. 2014) (emphasis in original) (quoting 29 U.S.C. § 1414(e)).  Parental notice and the opportunity to participate in the development of their child's IEP is an essential component of the IDEA.  *See Cerra*, 427 F.3d at 192-93.  "[T]he relevant inquiry is whether there is "a full discussion with the child's parents, before the child's IEP is finalized, regarding

drafted content and the child's needs and the services to be provided to meet those needs." *Danielle G. v. New York City Dep't of Educ.*, No. 06-CV-2152 (CBA), 2008 WL 3286579, at *6 (E.D.N.Y. Aug. 7, 2008) (citing *Cerra*, 427 F.3d at 193).

At a minimum, the DOE "must take steps to ensure that one or both of the parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate, including [ n]otifying parents of the meeting early enough to ensure that they will have an opportunity to attend." 34 C.F.R. § 300.322(a). The DOE notice "must [i]ndicate the purpose, time, and location of the meeting" and meet other regulatory mandates. *Id.* § 300.322(b). An IEP meeting may go forward without the participation of the parent "if the public agency is unable to convince the parents that they should attend." *Id.* § 300.322(d).

Plaintiff did not participate in the June 20, 2017 CSE meeting. She contends that she did not receive advance notice of the meeting. The DOE counters that it provided Plaintiff with notice of the meeting, and points to evidence in the record in support, including testimony of the DOE school psychologist, entries in the DOE's event log, and a copy of the meeting notice letter. (Dkt. 42 ¶ 5; Dkt. 18-1 at 756, 759, 783.) The SRO concluded that Plaintiff's "testimonial assertions that she did not receive the notice for the June 20, 2017 CSE meeting or any telephone calls from the CSE do not outweigh the district's evidence that there were multiple attempts to schedule a CSE meeting, [and] that the district notified the parent of the June 20, 2017 CSE meeting…." (Dkt. 18-1 at 20.)

The DOE fails to show that it provided advance notice to Plaintiff of the June 20, 2017 CSE meeting. Although the DOE contends that it sent the notice to Plaintiff on May 12, 2017, the record is insufficient to support a conclusion that the notice was actually mailed. Under New York law, there is a rebuttable presumption that a mailed letter was received by the addressee. *See Meckel v. Continental Resources Co.*, 758 F.2d 811, 817 (2d Cir. 1985). "To invoke the presumption, a party must first produce evidence of mailing, either by offering the testimony of the person who actually mailed the letter or

through indirect evidence such as proof that the mail was sent through office procedures followed in the regular course of business." *Bronia, Inc. v. Ho*, 873 F. Supp. 854, 859 (S.D.N.Y. 1995) (citing *Capital Data Corp. v. Capital Nat. Bank*, 778 F. Supp. 669, 675 (S.D.N.Y. 1991)); *see also Zambrana v. Pressler & Pressler, LLP*, No. 16-CV-2907 (VEC), 2016 WL 7046820, at *4 (S.D.N.Y. Dec. 2, 2016) ("Because, however, [defendants' witness] does not purport to have first-hand knowledge of whether the 2010 Agreement was sent to [p]laintiff and does not describe a standard office mailing procedure, [d]efendants have no evidence that the 2010 Agreement was sent to [p]laintiff or that she otherwise received the 2010 Agreement.")

The DOE school psychologist testified that "I sent—I didn't email this—the other meeting notice, because, you know, [Plaintiff] indicated that that wouldn't be—that she doesn't approve of that. So a meeting notice was mailed for 6/20." (Dkt. 18-1 at 181.) The DOE event log similarly has a note for May 12, 2017 that "Letter sent today." (Dkt. 18-1 at 783.) There is no specific testimony in the record, or any record evidence, that the DOE school psychologist properly mailed the meeting notice. In earlier testimony, the DOE school psychologist explained that when she mailed a letter, she "put [the letter] in the envelope myself," but that she "didn't put it in the mail slot, but it goes into our mail bin." (Dkt. 18-1 at 172.) Placing an addressed envelope in an office mail bin does not establish proof of mailing. *See, e.g., J.T.M. Grp., Inc. v. Fleischman*, No. 2000-1797 (SC), 2001 WL 1665333, at *1 (N.Y. App. Oct. 24, 2001) (placing mailing in "outgoing mail basket" insufficient to establish proof of mailing); *see also William Gardam & Son v. Batterson*, 198 N.Y. 175, 178-179 (N.Y. 1910) (testimony that insurance executive placed "sealed, stamped" envelope "in a box, or tray on my desk to be mailed to the post office, the same as I always do with every letter going from my office" did not establish proof of mailing). The record does not contain any evidence of office procedures concerning mailing. *Cf. Riker Danzig Scherer Hyland & Perretti LLP v. Premier Capital, LLC*, No. 15-CV-08293 (ALC)(AJP), 2017 WL 2779709, at *6 (S.D.N.Y. June 26, 2017) (incomplete description of

office procedures, even though it included putting envelopes into "outgoing bin," insufficient to show actual mailing).  The May 12, 2017 entry in the DOE event log stating "Letter sent today" does not establish proof of actual mailing, because that entry was made by the DOE school psychologist and not someone with knowledge of the actual mailing.  (*See* Dkt. 18-1 at 783.)

The SRO's decision to "infer from [the DOE school psychologist's] testimony that the psychologist follows a process for mailing documents" is not supported by law.  (Dkt. 18-1 at 20.)  *See Gonzalez v. Ross*, 47 N.Y.2d 922, 923 (N.Y. 1979) (holding that even in administrative hearings, where there are less stringent evidentiary requirements for proof of mailing, there must nevertheless be some evidence that an office procedure for mailing was established or followed); *Elia v. Highland Cent. Sch. Dist.*, 78 A.D.3d 1265, 1267 (N.Y. App. 2010) (affidavit that failed to specify procedure for mailing, who would have mailed it, or that procedures were followed is insufficient to establish proof of office procedure); *see also I.B. v. New York City Dep't of Educ.*, No. 15-CV-01309 (LTS), 2016 WL 1069679, at *11 (S.D.N.Y. Mar. 17, 2016) (no deference to state administrative officers where conclusions incorrect as a matter of law).  To the extent the SRO's conclusion that Plaintiff had notice of the June 20, 2017 meeting was based on a determination that Plaintiff's testimony was not credible, the DOE was nevertheless required to offer evidence that it complied with the IDEA's notice requirements, which it failed to do.  *See Mr. "M" ex rel "K.M." v. Ridgefield Bd. of Educ.*, No. 05-CV-584 (RNC), 2007 WL 987483, at *6 n.6 (D. Conn. Mar. 30, 2007) ("The IHO's finding that the parents chose not to attend the meeting … is at odds with the testimony of [the student's] mother.  Assuming the finding reflects a permissible decision by the IHO to decline to credit the mother's testimony, it does not absolve the Board of responsibility.  The burden remained with the Board to satisfy its obligation under the law to take affirmative steps to try to secure the important objective of having the parents participate in the meeting.")  The undersigned therefore finds that the DOE did not offer sufficient evidence to establish that it notified Plaintiff of the June 20, 2017 meeting.

While there is evidence in the record that DOE made substantial efforts to contact Plaintiff on the day of the CSE meeting, those communications would not have provided the notice required under the IDEA. The DOE school psychologist tried to call and email Plaintiff immediately before, during, and at the end of the meeting. (Dkt. 42 ¶¶ 4, 6, Dkt. 18-1 at 709, 710, 759-60, 781.) But in the absence of evidence that Plaintiff knew the date of the meeting, these efforts could not have been "early enough to ensure that [Plaintiff would] have an opportunity to attend" the CSE meeting. *See* 34 C.F.R. § 300.322(a)(1).

The undersigned finds that DOE's failure to provide Plaintiff with adequate notice of the date and time of the CSE meeting "significantly impeded the parent['s] opportunity to participate in the decisionmaking process. 20 U.S.C. § 1415(f)(3)(E)(ii)(II); *R.E.*, 694 F.3d at 190.

  2. *Summit School Notice of the CSE meeting*

Along with the parents, the input of a child's educators is important to the development of the IEP. *See* 20 U.S.C. § 1414(d)(1)(B); *Frank G.*, 459 F.3d at 363. The IDEA requires that the team that develops a student's IEP include a regular education teacher of the student if the student is or may be participating in the regular education environment. 20 U.S.C. § 1414(d)(1)(B)(ii) and (iii); *see also R.G. v. New York City Dep't of Educ.*, 980 F. Supp. 2d 345, 361 (E.D.N.Y. 2013) ("Participation in the CSE of a regular education teacher who is or may be responsible for implementing a portion of a child's IEP is critical to meeting" the IDEA's objectives). New York law requires the participation of both a regular and special education teacher of the student. N.Y. Educ. Law § 4402(1)(b)(1)(a)(ii) and (iii).

The CSE meeting did not include any of E.J.'s regular or special education teachers. (Dkt. 18-1 at 21-22.) Plaintiff argues that this, too, was a procedural violation that denied E.J. a FAPE. The DOE argues that the Summit School was invited to attend and had knowledge of the June 20, 2017 meeting. Plaintiff counters that the Summit School had no notice of the meeting. While the SRO

acknowledged that there was no general education teacher present at the meeting, neither the IHO

nor the SRO made an express finding of whether the Summit School had notice.[14]

On the issue of notice to the Summit School, the DOE school psychologist testified,

> The school is always invited.  I invited them through Outlook.  I have a system with that school in particular because there's so many kids.  So I have a system where I invite them and ask for the documents that I need, and I inform the school at the same time … So it was likely an oversight if it doesn't appear on here. … I never have a meeting without cross-checking and making sure … Sometimes they don't get it, sometimes – I don't know what happens.

(Dkt. 18-1 at 254-255.)  The DOE school psychologist also testified that she believed the Summit

School had notice because she had documents from the Summit school and "I would not have the

documents if they didn't know about the meeting, and they sent me documents."  (Dkt. 18-1 at 255.)

Contrary to the DOE's assertions, the Summit School clinical director testified, "Nobody on

staff knew about [the June 20, 2017 meeting].  We put things on our calendar when we get the

information, there was nothing on the calendar, we didn't get anything in writing, there was nothing

left on our voicemail indicating that there was going to be a meeting.  We did not know."  (Dkt. 18-1

at 334.)  The Summit School clinical director further testified about the steps that the School would

have taken to prepare for the meeting had it been notified, including holding preparatory meetings

among the Summit School staff, and stated that those steps never occurred.  (Dkt. 18-1 at 336-337.)

Other Summit School employees testified that they did not have notice of the CSE meeting and would

have participated if they had.  (Dkt. 44 ¶ 7; Dkt. 18-1 at 381-82; 409-410; 519-520.)

In reaching its conclusion that there were no procedural violations that amounted to the denial

of a FAPE, the SRO did not make any credibility determinations about this conflicting testimony of

the DOE and the Summit School.  In the absence of any such determination, the undersigned finds,

---

[14] The SRO decision focuses on the absence of any of E.J.'s regular education teachers, but because E.J. attended Summit School and no Summit School teachers attended, it is clear from the record that none of E.J.'s special education teachers attended, either.

based on the record, that the Summit School was not notified of the June 20, 2017 CSE meeting. The record does not contain any Outlook invitation, either as an independent exhibit or as a notice on the DOE event log. Nor does the record specify the date on which E.J.'s evaluative documents were sent by the Summit School or received by the DOE. Because there were several earlier attempted meetings in April and May 2017, the school may have sent the documents in response to an earlier-received CSE meeting invitation, rather than in response to a notification of a meeting on June 20, 2017.[15] The May 12, 2017 letter that the DOE school psychologist testified she sent to Plaintiff does not mention that the Summit School was invited. (Dkt. 18-1 at 756.) The testimony of the DOE school psychologist thus boils down to an understandable belief, based on her regular practice and her review of her records, that she notified the Summit School, but no actual recollection of sending an invitation. Against this is the testimony of four employees of the Summit School who expressly deny that they had notice. The weight of the evidence therefore favors a finding that there was no notice.

Despite the Summit School clinical director's request to postpone the CSE meeting so their staff could participate, the DOE school psychologist went ahead with the meeting. (Dkt. 18-1 at 335-336.) Thus, it was the DOE's decision that led to the exclusion of E.J.'s regular and special education teachers.

The undersigned finds that the failure to include a regular or special education teacher constituted a procedural violation of the IDEA because it "impeded [E.J.'s] right to a free appropriate public education." *See R.G.*, 980 F. Supp. 2d at 361-62.

### 3. *Consideration of Evaluative Information in Developing the 2017-18 IEP*

The parties agree that the record contained sufficient information to develop E.J.'s IEP.

---

[15] In the hearing before the IHO, Plaintiff's counsel asked the DOE school psychologist whether the documents she was referencing might have been sent to the DOE as part of an annual review process. (Dkt. 18-1 at 256-257.) The DOE school psychologist testified that she did not know about the annual review process, but noted that when annual reviews are scheduled, the DOE asks for documents. (*Id.*)

Plaintiff contends, however, that the CSE did not adequately consider the information in the record when developing the IEP, and in particular argues that the CSE failed to appropriately review records related to E.J.'s OT needs. The DOE counters that the CSE properly considered the available information in the record. After conducting a detailed review of the evaluative information available to the CSE and comparing it with the information in the IEP, the SRO concluded that the CSE did consider the evaluative information available to it. (Dkt. 18-1 at 31.) The IEP directly or indirectly references all the documents available in the record, including E.J.'s OT evaluations and mid-year reports. (Dkt. 18-1 at 731-735.) It makes specific recommendations regarding E.J.'s learning profile, self-regulation, distractibility, focusing deficits, need for sensory regulation, and her emotional needs. (*Id.*) The SRO's well-reasoned conclusion concerning the appropriateness of the materials considered is therefore entitled to deference.

\* \* \*

Because the DOE's failure to notify Plaintiff "significantly impeded the parent's opportunity to participate in the decisionmaking process," and because the failure to include E.J.'s regular and special education teachers "impeded the child's right to a [FAPE]," the undersigned finds that the DOE failed to comply with the procedural requirements of the IDEA, and that these procedural violations denied E.J. a FAPE. *See* 20 U.S.C. § 1415(f)(3)(E)(ii)(II); *R.E.*, 694 F.3d at 190 ("Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not").

### B.    Substantive Compliance With the IDEA

Courts must also examine whether the IEP complies with the IDEA's substantive requirements that it "include special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." *J.L.*, 2016 WL 6902137 at \*5 (quoting *C.F.*, 746 F.3d at 72).

The "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP." *Walczak,* 142 F.3d at 130. School districts are not required to furnish "every special service necessary to maximize each handicapped child's potential." *Rowley,* 458 U.S. at 199. "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *A.C.,* 553 F.3d at 173 (quoting *Cerra,* 427 F.3d at 195) (alteration in original).

"Substantive inadequacy automatically entitles the parents to reimbursement, as long as the parents' alternative placement was appropriate and equitable considerations favor reimbursement." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.,* 752 F.3d 145, 160 (2d Cir. 2014) (internal quotations omitted).

  1.  *Waiver*

The IDEA provides that a parent may file a due process complaint to challenge IEP determinations. *See* 20 U.S.C. § 1415(b)(6). Arguments not raised in a parent's due process complaint are generally waived, "unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B). However, "the waiver rule is not to be mechanically applied." *See C.F.,* 746 F.3d at 78. A court can consider an issue if (1) the due process complaint provides the DOE fair notice; (2) "both the IHO and SRO reached the issue on the merits, giving [the court] a record for review;" and (3) the issues "are at the heart of th[e] dispute." *See id.*; *see also B.P. v. New York City Dep't of Educ.,* 634 Fed. App'x 845, 849-50 (2d Cir. 2015); *see also H.W. v. New York State Educ. Dep't,* No. 13-CV-3873 (SIL), 2015 WL 1509509, at *15 (E.D.N.Y. Mar. 31, 2015) *C.U. v. New York City Dep't of Educ.,* 23 F.Supp.3d 210, 223–24 (S.D.N.Y. 2014).

The DOE contends that Plaintiff waived her right to object to the IEP's substantive determination recommending a general education class with ICT services because Plaintiff did not

expressly object to it in her due process complaint. Plaintiff's due process complaint did, however, raise a challenge, albeit broadly, to the CSE's substantive determination. Her stated basis for challenging the IEP was that it offered E.J. an "inappropriate education placement … in light of her special and unique needs," and it was "not appropriate to address E.J.'s academic, social and emotional challenges." (Dkt. 18-1 at 630.) This broad challenge to the substantive adequacy of the IEP gave DOE fair notice of the issues Plaintiff would raise at the state administrative hearing. Furthermore, the IHO and SRO both reached the merits on Plaintiff's substantive challenges to the IEP, and the appropriateness of the IEP goes to the heart of this dispute. In light of the "more plaintiff-friendly standard" for waiver articulated by the Second Circuit, *see H.W.*, 2015 WL 1509509, at *15 (quoting *C.U.*, 23 F. Supp. 3d at 223–24), the undersigned finds that Plaintiff did not waive her substantive challenges to the IEP.

2. <u>*Whether the IEP offered a FAPE*</u>

In the preliminary statement to its Motion for Summary Judgement, the DOE urges the Court to find that "DOE's recommendations for the Student were reasonably calculated to enable the child to receive educational benefits." (Dkt. 43 at 5.) DOE does not provide any argument on substantive adequacy.

The SRO issued a well-reasoned and thorough decision on matters of state educational policy. The SRO upheld the IHO's conclusion that the IEP failed to comply with the substantive requirements of the IDEA, albeit on different grounds from the IHO. The SRO determined that the IHO's findings concerning "functional grouping" were inappropriate because they were not mentioned in Plaintiff's due process complaint, and the DOE did not "open[] the door" to them, and they were not adequately developed in the hearing record. (Dkt. 18-1 at 17-18.) The SRO nevertheless conducted a detailed weighing of the appropriateness of the IEP's recommendation of ICT services in a general education classroom based on the evidence presented at the hearings. (Dkt. 18-1 at 31-

27

34.)  The SRO balanced the DOE's evidence against the evidence provided by Plaintiff's witnesses. (Dkt. 18-1 at 31-33.)  The SRO's assessment was highly individualized, noting that while ICT services would generally provide a student with E.J.'s profile with a FAPE, the records from the Summit School suggested that ICT services alone would be insufficient for E.J.  (Dkt. 18-1 at 33-34.)

      The SRO stated that the testimony of a regular education teacher at the CSE might have "allayed [the SRO's] concerns," but the DOE failed to offer that testimony in evidence.  (Dkt. 18-1 at 34.)  The SRO suggested that the decision was a close one, but that "[o]n this record [the SRO] cannot conclude that the district convincingly established that a general education class with ICT services would be appropriate" for E.J., given her unique needs.  (*Id.*)  In a footnote, the SRO emphasized how close the decision was, noting that if it had been Plaintiff's burden to show that the IEP's offering was inadequate, as opposed to the DOE's burden to show it was adequate, the SRO might have reached a different conclusion.  (*Id.*)  In these circumstances, the Second Circuit has made clear that it is not the role of a federal court to put its thumb on the other side of the scale on difficult matters of state education policy.  *See M.H.*, 685 F.3d at 240 ("District courts are not to make 'subjective credibility assessment[s],' and cannot 'ch[oose] between the views of conflicting experts on ... controversial issue[s] of educational policy ... in direct contradiction of the opinions of state administrative officers who had heard the same evidence'") (quoting *Grim v. Rhinebeck Central School Dist.*, 346 F.3d 377, 383 (2d Cir. 2003) (alterations in original).  The undersigned therefore defers to the SRO's determination that the IEP substantively denied E.J. a FAPE.

## II.     Prong II: Appropriateness of the Unilateral Placement

      A parent may reject the CSE's recommendations in an IEP and unilaterally place their child in a private school pending an appeal of the CSE's decision, but "do so at their own financial risk."  *J.L.*, 2016 WL 6902137 at *1.  Parents may retroactively seek reimbursement from the state for a unilateral placement.  20 U.S.C. § 1412(a)(10)(C)(ii).  A parent seeking reimbursement must establish that "the

private placement is appropriate, even if the proposal in the IEP is inappropriate." *Frank G.*, 459 F.3d at 364. In general, "the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered in determining the appropriateness of the parents' placement … [*i.e.*, whether the placement is] reasonably calculated to enable the child to receive educational benefits." *Id.* (citing *Rowley*, 458 U.S. at 207).

The DOE urges the Court to reject the SRO's finding and adopt the IHO's conclusion that the Summit School was not an appropriate placement. The DOE argues that the record showed E.J. made inconsistent progress, struggled academically, and had behavioral challenges at the Summit School. Pointing to the IHO's statement that E.J. "was not doing well in any of her classes," the DOE argued that it is "at best … unclear whether the program at Summit School is meeting" E.J.'s needs. (Dkt. 43 at 23.) Plaintiff counters that the Summit School has programs that meet E.J.'s needs, and the SRO's well-reasoned determination that it was an appropriate placement warrants deference.

The SRO's decision is the final decision of state authorities on the appropriateness of the Summit School and is therefore entitled to deference, even though the SRO and IHO disagreed with each other. *See M.B.*, 523 Fed. App'x at 77; *M.H.*, 685 F.3d at 241. The SRO correctly described the standard for appropriateness laid out by the Second Circuit:

> [P]arents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specifically designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.

(Dkt. 18-1 at 35-36) (quoting *Gagliardo*, 489 F.3d at 112.) The SRO then considered in detail whether the Summit School met that standard. The SRO evaluated the programming offered by the Summit School generally, and then the specific programming that E.J. was offered, by conducting a detailed examination of the hearing record before the IHO. (Dkt. 18-1 at 36-38.) Based on its searching review, the SRO concluded that the Summit School provided instruction and support services that

met E.J.'s unique needs.  (Dkt. 18-1 at 38.)

The SRO also considered E.J.'s progress, another indication that the SRO's opinion was thorough and well-reasoned.  (Dkt. 18-1 at 38-41.)  The SRO correctly stated that progress is neither necessary nor sufficient to a determination that the unilateral placement is appropriate, but it is relevant.  (Dkt. 18-1 at 38-39) (citing cases).  The SRO noted that E.J. made progress during the 2017-18 school year, citing to specific testimony by the Summit School clinical director and E.J.'s teachers that she had improved on several challenges associated with her disability.  (Dkt. 18-1 at 39-41.)  The SRO concluded that E.J.'s inconsistent progress "appears to relate directly to the student's disability," and therefore did not preclude a finding that the Summit School was an appropriate placement.  (Dkt. 18-1 at 41); *see also Davis v. Wappingers Cent. Sch. Dist.*, 431 Fed. App'x 12, 16 (2d Cir. 2011) ("While the SRO did agree with the IHO that the progress of [p]laintiffs' son was 'disappointing' during his eighth grade year, it noted that this factor was not dispositive and proceeded to focus its analysis of the appropriateness of the placement on a review of the student's particular needs related to his disability and the manner in which [the school's] program was designed to address those needs at the time the unilateral placement was made").

A district court may only favor the IHO decision where it is well-reasoned and the SRO's decision is poorly reasoned or otherwise unsupportable.  *Cf. R.E.*, 694 F.3d at 189 ("[A] court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead").  Because this is a matter of state education policy, the fact that the SRO's decision is thorough and well-reasoned alone would be enough to uphold it.  But the undersigned also notes that the IHO's decision is not well-reasoned insofar as it appears to place a premium on progress over the factors laid out by the Second Circuit for evaluating the appropriateness of a unilateral placement.  (*See* Dkt. 18-1 at 56-57.)  And to the extent that the IHO's decision examined whether the Summit School

30

offered educational instruction that meets E.J.'s needs, it focused on the Summit School's absence of functional grouping, which the SRO properly concluded was not appropriate for consideration. (*Compare* 18-1 at 17-18 with Dkt. 18-1 at 56-57.)

The undersigned therefore recommends that the Court affirm the SRO's decision and find that the Summit School was an appropriate placement.

## III.   Prong III: Equitable Considerations

If the IEP fails to provide a FAPE, "equitable considerations are relevant in fashioning relief." *Burlington*, 471 U.S. at 374 (quoting 20 U.S.C. § 1415(e)(2) (a court may grant "such relief as the court determines is appropriate")). "The authority to grant reimbursement is discretionary—the court 'has broad discretion to consider the range of all relevant facts in determining whether and to what extent awarding relief is equitable.'" *Bd. of Educ. of Wappingers Cent. Sch. Dist. v. M.N. on Behalf of J.N.*, No. 16-CV-09448 (TPG), 2017 WL 4641219, at *9 (S.D.N.Y. Oct. 13, 2017) (quoting *J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 671 (S.D.N.Y. 2011)).

One such factor is the "unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a)(10)(C)(iii)(III); *see J.L.*, 2016 WL 6902137 at *8. "Important to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 840 (2d Cir. 2014); *see also Frank G.,* 459 F.3d at 363–64 ("equitable considerations relating to the reasonableness of the action taken by the parents are relevant in fashioning relief") (internal quotations and alterations omitted).

Parents and school officials have "shared responsibility for [their] relationship," and a court should consider both sides' actions in fashioning equitable relief. *See T.K. v. New York City Dep't of Educ.*, 810 F.3d 869, 879 (2d Cir. 2016). A parent's obstruction should only preclude reimbursement if it is the parent's own "acts or omissions that hinder [the DOE] from meeting its statutory obligation

in the first place." *See A. v. Greenwich Bd. of Educ.*, No. 3:15-CV-00203 (CSH), 2016 WL 3951052, at *19 (D. Conn. July 20, 2016).

Unlike with questions of substantive state education policy, state administrative officers do not bring special expertise to bear in equitable determinations, and thus their equitable conclusions are entitled to less deference on review. *See, e.g., G.S.*, 2017 WL 2918916 at *13. Indeed, federal courts are well-equipped to evaluate the equities. *See W.M. v. Lakeland Cent. Sch. Dist.*, 783 F.Supp.2d 497, 503 (S.D.N.Y. 2011) (district courts have "particular expertise" and "broad discretion" when engaging in a "balancing of the equities").

Plaintiff argues that the SRO's determination to deny tuition reimbursement on equitable grounds was erroneous, and that a more searching review of the record would show that Plaintiff was not uncooperative and should be entitled to tuition reimbursement.[16] The DOE argues that the shared conclusion of both the IHO and SRO that the equities did not favor reimbursement is entitled to deference. It also points to evidence in the record that the DOE repeatedly rescheduled the CSE to a time that Plaintiff specifically requested and "made significant efforts to secure the parent's participation." (Dkt. 43 at 23.) The DOE argues that Plaintiff, meanwhile, was not responsive, withheld consent for reevaluations, and was otherwise uncooperative. Had Plaintiff been more cooperative, the DOE argues, pointing to the SRO's decision, "it would have eliminated some of the alleged defects now relied upon by the parent." (Dkt. 43 at 24.)

---

[16] Several of Plaintiff's arguments on the equities—that the SRO should not have considered the 2016 Appeal, that the SRO's reference to E.J.'s father was an inappropriate equitable consideration, that denial of a FAPE should have been an equitable consideration, and that she did not receive notice of the IEP—are completely unsupported by the record or by law, and should be rejected. The SRO appropriately considered the parties' behavior in the 2016 Appeal, as it went to the reasonableness of Plaintiff's refusal to consent to updated evaluations. The SRO described the DOE's attempts to contact E.J.'s father, but did not mention that fact in its evaluation of the equities. That E.J. was denied a FAPE is a prerequisite to the consideration of the equities, not a factor in weighing them. *See S.W. v. New York City Dep't of Educ.*, 646 F. Supp. 2d 346, 364 (S.D.N.Y. 2009) ("[T]he fact that the DOE failed to provide an adequate FAPE is a fact common to all due process challenges that meet the first prong of *Burlington;* it is not an independent factor that should be considered when weighing the equities"). And while Plaintiff testified that she did not receive the IEP until October, her ten-day notice dated August 22, 2017 complained about the substance of the IEP. (Dkt. 18-1 at 21 n.9.)

The record shows clear instances of Plaintiff's non-cooperation. Although Plaintiff and DOE entered into a written agreement for DOE to fund and conduct reevaluations for E.J. following the 2016 appeal (Dkt. 18-1 at 22-23), Plaintiff later refused to provide consent for such reevaluations (Dkt. 18-1 at 722, 723, 728, 781).

Federal regulations under the IDEA mandate regular reevaluations of children with disabilities. *See* 34 C.F.R. § 300.303(a). Absent an agreement otherwise between the parent and the DOE, reevaluations must occur every three years, but may occur as often as every year. *Id.* § 300.303(b). Reevaluations must occur "[i]f the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation." *Id.* § 300.303(a)(1); *see also C.S. v. Yorktown Cent. Sch. Dist.*, No. 16-CV-9950 (KMK), 2018 WL 1627262, at *12 (S.D.N.Y. Mar. 30, 2018).

Federal regulations also require parental consent to reevaluations in most instances. 34 C.F.R. § 300.300(c). But if a parent refuses consent to reevaluation of a child placed in a private school by the parent, the DOE "is not required to consider the child as eligible for services" under the IDEA. *See id.* § 300.300(d)(4).

The SRO's conclusion that Plaintiff was uncooperative with the reevaluations is convincing and supported by the evidence. Plaintiff's refusal to consent to reevaluations was not reasonable, for at least three reasons. First, the record suggests she agreed to the reevaluations, in writing, after the 2016 Appeal. Second, Plaintiff continued to refuse to consent to reevaluations despite the DOE's explanation that reevaluations were necessary. (*See* Dkt. 18-1 at 177-81, 781-82.) Third, Plaintiff's refusal is unsupported by the law, which allows for yearly reevaluations if the DOE determines they are necessary. 34 C.F.R. § 300.303(a)(1); *see also C.S.*, 2018 WL 1627262 at *12. The DOE made such a determination here. (*See, e.g.*, Dkt. 18-1 at 781-82.)

Plaintiff's communications with DOE were also inconsistent and contradictory. On May 10,

33

2017, Plaintiff wrote to the DOE school psychologist that she could "be reached by cell … or by email" (Dkt. 18-1 at 722, 784), but three days later, on May 13, 2017, she wrote that she had not given permission for the CSE to communicate with her by email and demanded that all communications be sent in writing to her home address (Dkt. 18-1 at 723, 781; Dkt. 42 ¶ 4). She nevertheless continued to send emails to the DOE on multiple occasions after indicating that she did not consent to email communications. (*See* Dkt. 18-1 at 781-783.) The record also contains many examples of unanswered phone calls to Plaintiff's various phone numbers. (*See, e.g.*, Dkt. 18-1 at 782-784.)

While the DOE's request for reevaluations was consistent with federal regulations, as the SRO noted, if a parent refuses consent to reevaluation of a child placed in a private school by the parent, the district "is not required to consider the child as eligible for services" under the IDEA. (Dkt. 18-1 at 23-24) (citing 34 C.F.R. § 300.300(d)(4).) Plaintiff's refusal to make E.J. available for reevaluation could have put an end to this entire process. But as the SRO also noted, "the district did not avail itself of the option to no longer treat the student as eligible and … instead proceeded with its meeting on June 20, 2017 and continued to treat the student as eligible for special education…" (Dkt. 18-1 at 24.) Having decided to convene the CSE, the DOE was then required to develop an adequate IEP that provided a FAPE. 34 C.F.R. § 300.306(c)(2).

The undersigned finds that the DOE acted unreasonably in developing the IEP, and the substantive inadequacy of the IEP is the result of the DOE's unreasonable actions. In considering the IEP's inadequacy, the SRO suggested that the presence of a regular education teacher at the CSE meeting might have allayed concerns about the flaws in the IEP's proposal for ICT services in a general education classroom. (Dkt. 18-1 at 34.) It was the DOE's responsibility to ensure the presence of a properly constituted CSE, including a regular and special education teacher. 34 C.F.R. § 300.321(a) ("The *public agency* must ensure that the IEP Team for each child with a disability includes" a regular and special education teacher) (emphasis added). The DOE chose to ignore the Summit

School's request to postpone the June 20, 2017 CSE meeting to a time when the school could fully participate. (Dkt. 44 ¶ 7; Dkt. 18-1 at 709.) There is no suggestion in the record that Plaintiff's non-cooperation with DOE had anything to do with the Summit School's lack of notice of the CSE, or that the Summit School had been similarly uncooperative. *Compare A. v. Greenwich Bd. of Educ.*, 2016 WL 3951052, at *20 ("[I]n order for equitable considerations to bar reimbursement in this case, there must have been an act or omission on the part of [plaintiffs] that in some way obstructed the [school district's] provision of a FAPE to [the child]").

When balancing the equities, the SRO speculated that if Plaintiff had "more fully cooperated, especially with the reevaluation process, the CSE might have avoided some of the defects later found in the IEP." (*See* Dkt. 18-1 at 42.) While reevaluations may have been available if Plaintiff had been more cooperative, the SRO does not explain how those reevaluations would have made it less "difficult to overlook the description of the student's progress during the 2016-17 school year, as described in Summit evaluations and progress reports, which indicate that even with the individualized support and a low student-to-teacher ratio, the student continued to make inconsistent progress." (*See* Dkt. 18-1 at 33-34.) Similarly, the SRO fails to explain how the reevaluations would have been able to "allay[ his] concerns" in the same way as the "input of a regular education teacher at the CSE meeting who was familiar with how a student with this level of distractibility could or could not make progress toward her annual goals in an ICT setting." (*Id.*)

The undersigned respectfully finds that the SRO's hypothetical conclusion is not supported by the record and is not entitled to deference. The SRO found that the CSE appropriately considered the evaluative information in the record. (Dkt. 18-1 at 31.) The SRO, reviewing the same information that the CSE reviewed, determined that the CSE failed to develop an IEP that provided a FAPE. Thus, although Plaintiff was uncooperative, the procedural and substantive inadequacies in E.J.'s IEP were not the result of her uncooperativeness, but rather can be traced to the DOE's actions, *i.e.*, its

35

failure to provide adequate notice of the CSE meeting to Plaintiff and the Summit School, and its refusal to postpone the June 20, 2017 CSE meeting.  Accordingly, the undersigned respectfully recommends a finding that the equities do not weigh against Plaintiff's request for tuition reimbursement, and that Plaintiff be granted full tuition reimbursement.  *See Frank G.*, 459 F.3d at 372 ("The Supreme Court has also instructed us that, because "'[t]he [IDEA] was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives.'") (quoting *Burlington*, 471 U.S. at 372) (alterations in original).

**IV.    Conclusion**

For the foregoing reasons, the undersigned respectfully recommends that Plaintiff's motion be granted, that the determination of the SRO to deny tuition reimbursement to Plaintiff be overturned, and that Plaintiff's request for reimbursement of tuition for the Summit School for the 2017-18 school year be granted.  The undersigned also respectfully recommends that Defendant's motion be denied.

Any objection to this Report and Recommendation must be filed in writing with the Clerk of Court within fourteen (14) days of service.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to timely file any such objection waives the right to appeal the District Court's Order.  *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:    Brooklyn, New York
          February 26, 2021